**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC.<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL GITOMER<br><br>Defendant. | ) | Civil Action No. ____________________ |

**VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Azurity Pharmaceuticals, Inc. ("Azurity") brings this action for preliminary and permanent injunctive relief and monetary damages against Defendant Mike Gitomer, and alleges as follows:

## I. PRELIMINARY STATEMENT

1. Defendant is a former employee of Azurity. He, in addition to two of his colleagues, left Azurity with the intent to join one of Azurity's competitors, Shorla Oncology, Inc. ("Shorla"). Both Azurity and Shorla develop and market pharmaceuticals. In particular, Shorla markets a product called Jylamvo, which directly competes with Azurity's product Xatmep, as both are pediatric oral liquid methotrexate products for acute lymphoblastic leukemia and polyarticular juvenile idiopathic arthritis.

2. Prior to his departure from Azurity, Defendant improperly maintained Azurity's confidential information and trade secret information by circulating various materials to his personal email address.

3. Azurity asks the Court to enjoin Defendant from sharing or using Azurity's Trade Secrets and to order other relief to prevent Defendant from benefiting from his unlawful actions

and to compensate Azurity for all harm inflicted by Defendant.

4. Azurity brings this action to protect its confidential information and trade secrets and to prevent Defendant from using such information to his own advantage.

## II. THE PARTIES

5. Azurity Pharmaceuticals, Inc., is a Delaware corporation whose high-level officers direct, control, and coordinate the corporation's activities from its U.S. headquarters in Woburn, Massachusetts.

6. Defendant Gitomer is an adult individual with a last known principal residence at 386 Amber Drive, Lititz, Pennsylvania.

7. Simultaneous with this Complaint, Azurity is separately initiating two additional actions against Defendant's co-conspirators: (1) an action in the Middle District of Florida against Sheila Bhattacharya ("Bhattacharya"), and (2) an action in the Western District of Pennsylvania against Kimberly Deacon ("Deacon").

## III. JURISDICTION AND VENUE

8. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Azurity asserts claims under the federal Defend Trade Secrets Act, 18 U.S.C. §1836.

9. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 by virtue of the parties' diversity of citizenship and because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

10. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367 because they are related to the federal claims in that they form part of the same case or controversy.

11. The Court has personal jurisdiction over Defendant because he resides in this

district.

12. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Azurity's claims occurred in this District, and Gitomer is subject to this Court's personal jurisdiction with respect to this action.

## IV. FACTUAL ALLEGATIONS

### A. Nature of Azurity's Business and Competitive Environment

13. Azurity Pharmaceuticals, Inc. ("Azurity") is a privately held specialty pharmaceutical company headquartered in Woburn, Massachusetts.

14. Azurity develops and commercializes innovative pharmaceutical products. It focuses on delivering medicines to underserved patient populations, particularly children and the elderly.

15. Azurity specializes in dose-form innovations of established medicines for patients who have unmet needs.

16. Azurity maintains a diversified portfolio of more than 50 medicines. Its products span ten dosage forms and ten therapeutic areas, including cardiovascular, central nervous system, endocrine, gastrointestinal, anti-infective, and oncology medicines.

17. The specialty pharmaceutical market in which Azurity operates is intensely competitive and rapidly evolving. The global specialty pharmaceutical market was valued at approximately $679 billion in 2024, with forecasts projecting growth to nearly $1.6 trillion by 2033.

18. The U.S. pharmaceutical market overall was valued at approximately $632 billion in 2024. It is projected to exceed $1 trillion by 2033. Market participants compete aggressively on the basis of product innovation, pricing, regulatory approvals, and customer relationships.

19. Azurity's products are marketed and sold in more than 50 countries worldwide, including the United States.

20. Within the United States, Azurity's sales representatives and business development personnel conduct outreach to physicians, healthcare providers, and pharmacies.

21. Azurity's primary customers include hospitals, healthcare providers, specialty pharmacies, and pharmaceutical distributors.

22. Azurity generates revenue through the sale of specialty pharmaceuticals to healthcare providers and distributors. Its transactions are typically structured as business-to-business agreements, with healthcare facilities purchasing medications to treat their patients.

23. Azurity also engages in exclusive distribution partnerships to extend its market reach.

24. Due to the highly competitive nature of the specialty pharmaceutical industry, the loss of proprietary business information, including customer relationships, pricing data, and product pipeline intelligence, can cause immediate and irreparable competitive harm.

**B. Defendant's Employment and Restrictive Covenants with Azurity**

**i. Defendant's Employment**

25. From approximately June 3, 2023, until June 3, 2026, Azurity employed Defendant Michael Gitomer as Director, Strategic Accounts, where he was responsible for supporting multiple product lines while advancing enterprise-wide pricing, reimbursement, and access strategies.

26. At Azurity, Defendant formerly reported to Bhattacharya, who served as Azurity's Vice President of Market Access & Strategic Accounts.

27. Deacon was also a member of Azurity's Strategic Accounts Team.

28. Defendant reviewed and completed training on Azurity's: (1) Confidentiality, Non-solicitation and Intellectual Property Assignment Agreement; (2) Code of Conduct; (3) Access Control Policy; and (4) Acceptable Use Policy.

**ii. Defendant's Access to Confidential Information and Trade Secrets**

29. Azurity required its employees, including Defendant, to participate in training regarding the importance of maintaining the confidentiality of its proprietary business information and trade secrets, both during their employment and afterward for as long as the information remains confidential.

30. Defendant was instructed on his responsibility to protect the confidentiality of Azurity's proprietary business information, including:

a. All customer lists, customer contacts, and the terms and expiration dates of every customer service agreement - past and present.

b. All proposals for services to prospective customers.

c. Azurity's budgeting and forecasting methods and data.

d. All sales figures, profit and loss data, profit margins, costs, overhead, and other financial, accounting, and bookkeeping information.

e. All information about Azurity's operations, business development, acquisition strategy, business strategy, and marketing plans.

f. The names, identities, and contact information for Azurity's vendors and suppliers - along with every term of every contract with those vendors and suppliers.

g. Management evaluations of Azurity's resources and assets, including technology, real estate, and employee performance.

h. All third-party information provided to Azurity in confidence, and all information developed using that third-party information.

31. Defendant was informed that he may not use or disclose any Confidential Information in any way that is not expressly authorized by Azurity and undertaken for its benefit, including by not copying, recreating, using, or disclosing Confidential Information for the benefit of any competitor or anyone preparing to compete with Azurity.

32. Additionally, Defendant was directed to return all records containing Confidential Information at the end of their employment with Azurity.

33. Azurity's Code of Conduct includes a provision stating that:

> All company-related or company-owned data and information - including those on our personal devices - are considered proprietary information and are the property of Azurity. These data and information are subject to inspection, review and/or collection by Azurity.

34. Azurity's Access Control Policy is specifically designed to "provide appropriate security requirements in ensuring the critical business data classified as Secret or Confidential information remains secure" and prohibits non-compliance.

35. Azurity's Acceptable Use Policy prohibits the use of personal email accounts for sharing confidential information, backup of Azurity information on unauthorized devices, and requires that all Azurity devices/account access be returned or ceased on an employee's last day of employment.

36. Azurity employees receive training regarding their confidentiality obligations, which training requires each employee acknowledge the following:

a. **Confidentiality Disclosure:**

> "Confidential Information" refers to information and compilations of information, in any form (tangible or intangible), related to the Company's business and of value to it that I first gain knowledge of or access to as a consequence of my employment with the Company if the Company has not

made it public or authorized public disclosure of it and it is not readily available through lawful and proper means to the public or others in the industry who have no obligation to keep it confidential. Confidential Information, including trade secrets, means information of any kind, nature, or description, that relates to the Company's business and operations or obtained by the Company in the course of its business operations which provides commercial value or has any business advantage and is not generally available to the public. Confidential Information will not lose its protected status under this Agreement if it becomes known through improper means such as unauthorized use or disclosure by Employee or any other person. Confidential Information may include but is not limited to: (i) all customer lists and all contacts at all customers currently or formerly serviced by the Company; (ii) the expiration dates and terms of all existing and former customer service agreements; (iii) the contents of all proposals for the provision of services to any prospective customer; (iv) the Company's budgeting and forecasting methods and data; (v) information regarding the Company's sales, profit and loss, profit margin, costs, overhead, and other bookkeeping, accounting and financial information; (vi) all information regarding the Company's operations, business development, acquisition and business strategy and marketing; (vii) names and identities of the Company's vendors and suppliers not well known to the trade and all contacts at the Company's vendors and suppliers; (viii) all terms of all contracts with the Company's vendors or suppliers and of all proposals for the supply of goods or services to the Company; (ix) all financial information with respect to the Company; (x) management evaluations of the Company's resources/assets (such as technology, real estate, and employee job performance); and (xi) all third party information provided to the Company on condition that the Company maintain same in confidence and all information developed by Employee or the Company in reliance on third party information. Due to its special value and utility as a compilation, a confidential compilation (like a client list) will remain protected as Confidential Information even if some items of information within the list are in the public domain. Private disclosure of otherwise Confidential Information to parties the Company is doing business with for business purposes shall not cause the information to lose its protected status under this Agreement.

**b. Nondisclosure Obligation:**

I agree that during my employment and for so long thereafter as the information qualifies as Confidential Information under this Agreement, I will not engage in any use or disclosure of Confidential Information that is not authorized by the Company and undertaken for the benefit of the Company[.] This obligation specifically prohibits, among other things, the copying, recreation, use or disclosure of Confidential Information for the benefit of a competitor or on behalf of any person or entity preparing to compete with the Company, and includes use or disclosure of information on social media. I will comply with all Company policies and directives concerning the use, storage, and transfer of

Confidential Information, and the protection of attorney-client privilege where it applies. These obligations do not prohibit my use of generally available knowledge, skill and education that is not specific to the Company or its business relationships but is instead knowledge generic to the industry or my profession. Unless prohibited by law from doing so, I will notify the Company as quickly as possible after being served with a subpoena, court order, or other legal mandate requiring the production of Confidential Information so that the Company can take reasonable steps to protect its interests and will cooperate in same. I will specifically prohibits, among other things, the copying ends without written Company authorization to do so. However, nothing in this Section 3.1 shall prohibit Protected Conduct (described in Section 9 below).

c. **Acknowledgement of Irreparable Harm for Disclosure:**

I acknowledge that some activities by me would, by their nature and irrespective of my intent, involve conversion of Company trade secrets and other Business Investments to the unfair advantage of competitors if engaged in shortly after my employment ends. To avoid the irreparable harm that would be caused by conduct of this nature, and **subject to any state-specific modification under Appendix A** that may apply to me, I agree to the following reasonable limitations (collectively referred to as my "Protective Covenants"), after my employment with the Company ends (my "Termination Date").

d. **Remedies for Actual or Threatened Breaches:**

A violation of this Agreement by me would cause not only actual and compensable damage, but also irreparable harm and continuing injury to the Company for which there would not be an adequate remedy at law. Accordingly, if I should breach or threaten to breach this Agreement, the Company shall be entitled to equitable remedies in the form of temporary and permanent injunctive relief to enforce this Agreement in addition to, and not in lieu of, any and all other legal remedies to which it would otherwise be entitled. Where permissible, no bond will be required if an injunction is sought to enforce any of the covenants set forth herein; provided, however, that if a bond is deemed necessary for issuance of injunctive relief to enforce my obligations, a bond of $1,000 shall be presumed sufficient. In addition to, and not in lieu of injunctive relief to prevent further violations, the Company will have the right to recover from me a sum equal to thirty percent of the annual compensation of any Covered Worker that the Company loses as a result of (in whole or in part) my breach of the Worker Nonsolicit. Company shall be deemed the prevailing party for all purposes if any relief is granted to it, irrespective of whether some relief requested by the Company is also denied. In the event that the Company pursues legal action to enforce the terms of this Agreement due to a breach or threatened breach by me, the Company shall be entitled to recover from me all costs and expenses, including without limitation, reasonable attorney's fees and expenses (including expert witness and investigation fees, and court costs) incurred by

> the Company in connection with such litigation, in addition to any and all other rights and remedies; provided, however, that if controlling law would convert the forgoing provision into a reciprocal obligation whereby either prevailing party could recover attorney's fees and expenses, then each party will bear its own attorney's fees and expenses.

**iii. Azurity Took Reasonable Steps to Protect Its Confidential, Proprietary and Trade Secret Information**

37. Azurity would not have employed or continued to employ Defendant without the assurances that he would retain the confidentiality of Azurity's information.

38. As a senior member of the Strategic Accounts team, Defendant had access to a great deal of highly confidential information and trade secrets, information which Azurity vigorously protects from competitors.

39. The confidential and proprietary information and trade secrets, all of which the Company authorized Defendant to access while serving as Azurity's employee, are highly sensitive, commercially valuable, and would be extremely useful to competitors in their efforts to compete with Azurity for business and market share.

40. Azurity invests substantial time, money, and other resources both to develop this confidential and proprietary information and takes (and has always taken) reasonable measures to protect it from dissemination to competitors and others outside of the company. These measures include, but are not limited to:

a. encrypting data on company-owned devices with access to company data;

b. password protecting all company-owned devices with access to company data;

c. taking reasonable measures to limit the disclosure and distribution of such information to individuals who need access to such information to perform

their job responsibilities; and

d. requiring all employees to affirm that they will maintain the confidentiality of Azurity's confidential and proprietary information and trade secrets..

41. Accordingly, the above-referenced confidential and proprietary information and trade secrets are not generally known to the public.

42. With access to highly sensitive, confidential, and proprietary information and trade secrets, Defendant has the knowledge necessary to engineer a strategy that would allow a competitor to unfairly and unlawfully compete with Azurity.

**iv. Azurity's Legitimate Business Interests**

43. Azurity possesses substantial and legally protectable business interests, including trade secrets, confidential business information, customer relationships, and goodwill. These interests are recognized and protected, including under Pennsylvania law. 12 Pa. Cons Stat § 5302 (2025).

44. Azurity's confidential information and trade secrets include, but are not limited to: customer lists and customer contacts; the terms and expiration dates of customer service agreements; proposals for services to prospective customers; budgeting and forecasting methods and data; sales figures, profit and loss data, profit margins, costs, and overhead; information about Azurity's operations, business development, acquisition strategy, and marketing plans; vendor and supplier identities and contract terms; management evaluations of company resources and assets; and third-party information provided to Azurity in confidence.

45. Azurity developed this confidential information over many years and at substantial expense. It maintains this information in confidence and does not make it available to the public or to competitors.

46. Azurity's customer relationships are the product of significant investment of time, resources, and effort by its sales and business development teams. These relationships give Azurity a competitive advantage that would be lost if disclosed to or exploited by a competitor.

47. Azurity prohibits its employees from using or disclosing Azurity's confidential information in any manner not expressly authorized by Azurity. Employees are further required to return all records containing confidential information upon the termination of their employment.

48. More particularly, Azurity's strategic accounts employees are entrusted with access to highly sensitive and competitively valuable information in the ordinary course of their work.

49. Strategic accounts personnel at Azurity have access to account-specific and product-specific pricing strategies and models. This information is not publicly available and is closely guarded as a trade secret.

50. These employees also have access to customer lists, including the identities of and contact information for key decision-makers at hospitals, specialty pharmacies, and healthcare systems.

51. Azurity's strategic accounts employees have access to detailed business review insights, product utilization data, contract-performance data, and rebate and chargeback data.

52. These employees gain detailed knowledge of Azurity's product pipeline, including strategies regarding the planned product and pricing strategies.

53. Such personnel develop close personal relationships with Azurity's customers. These relationships are built through years of repeated contact, trust, and service. They represent substantial goodwill belonging to Azurity.

54. The information described above—including pricing models, cost structures, pricing strategies, product pipeline, sales data, rebate or chargeback data, and similar knowledge—

constitutes protectable business interests under 12 Pa. Cons. Stat. §5302.

55. If a competitor were to obtain this information through a former employee, it could use it to undercut Azurity's pricing, target Azurity's existing customers, and gain an unfair competitive advantage. This would cause immediate and irreparable harm to Azurity's business.

**C. Defendant's Misconduct**

56. Bhattacharya separated from Azurity on or about September 2, 2025.

57. Defendant separated from Azurity on or about June 5, 2026.

58. Deacon separated from Azurity on June 19, 2026.

59. Unbeknownst to Azurity, and prior to their respective departures, Bhattacharya, Deacon and Defendant each retained confidential and proprietary information and trade secrets.

60. Prior to her departure, Bhattacharya e-mailed to her personal e-mail address, documents that contained Azurity's confidential and proprietary information and trade secrets:

a. This included a PowerPoint presentation involving commercial due diligence marked "Private and Confidential" that Azurity commissioned regarding a code-named project on a specified pharmaceutical that included sensitive prescriber insights, payer insights, pharmaceutical treatment parameters, prescriber research, payer research (that included different pricing and insurance coverage options research), research regarding product utilization rates, amongst other sensitive information.

b. Bhattacharya also e-mailed a copy of an Oncology Monthly Franchise Alignment Review Meeting PowerPoint Presentation, that addressed business strategy and strategic plan with product budget, net revenues, actual versus projected unit sales, performance by region, top health care provider to target

for each region, and related information regarding one of Azurity's pharmaceutical products.

61. In or about June 2026, Bhattacharya became the Chief Commercial Officer for one of Azurity's competitors, Shorla.

62. Azurity and Shorla directly compete with at least one pharmaceutical product, with Shorla producing a pharmaceutical, Jylamvo, which directly competes with Azurity's product, Xatmep, as both are pharmaceuticals within the liquid pediatric oncology medication market.

63. Defendant and Deacon have recently begun working for Shorla as Strategic Account Managers/Directors, alongside Bhattacharya.

64. Prior to leaving Azurity and unbeknownst to Azurity at the time, Defendant and Deacon both forwarded to their personal e-mail addresses confidential and proprietary information and trade secrets owned by Azurity.

65. Prior to leaving his employment with Azurity, Defendant misappropriated Azurity's trade secrets, proprietary business and/or confidential information by forwarding information from Azurity's systems to his personal email address.

66. Deacon sent herself documents containing Azurity's confidential and proprietary information via emails from Deacon's Azurity email account to Deacon's personal email account on numerous occasions during his last several weeks of employment (between June 7and June 22).

67. Defendant sent himself documents containing Azurity's confidential and proprietary information via emails from his Azurity email account to his personal email account on over dozen dates during his last month of employment (between May 5 and June 5).

68. The documents containing confidential and proprietary information which Gitomer emailed to himself include, among other things, internal market-access and GPO/IDN business

plans, customer account trackers, product-specific pricing, rebate, discount, 340B information, chargeback transaction records, draft and executed customer and supplier contracting materials, payer and competitive-intelligence presentations, detailed health-system and pharmacy contact lists containing account notes, product interests, follow-up plans, utilization assumptions, and revenue/reimbursement analyses.

69. Of particular note, the materials Defendant sent himself include materials that reference Azurity's Xatmep, the competitor product for Shorla's Jylamvo, among other confidential and trade secret information of Azurity:

a. On Tuesday May 5, 2026, Defendant forwarded himself an email from February 2026 which contained *GTN Model - IDN GPO FY26 (Vivimusta) v1.xlsx*, which is an excel sheet containing detailed price and other strategy information for Azurity's drug Danziten. The information in this file includes non-public pricing, net sales figures, gross margins, variance percentages, and other highly confidential strategy and market data.
b. On Wednesday May 6, 2026, Defendant sent himself an email thread from April 2026 between Azurity employees and customer contacts at Vanderbilt Health, which included requests for meetings and client contract information, including a list of customer representatives.
c. On Thursday May 7, 2026, Defendant sent himself *Nymalize LOP Template Draft.docx*, which is a letter of participation template used by Azurity representatives in making proposals for services to prospective customers. This template contains non-public drug rebate offers, including details on product sizes available and the dates during which the offers would be available.
d. On Friday May 8, 2026, Defendant sent himself *Email w carepathrxllc contacts.pdf*, which included a list of client contacts as well as details noting the client's particular interest in partnering with Azurity for business needs.
e. On Monday May 11, 2026, Defendant sent himself *Aggregation Group Profiles – Q2 2026.pdf*, which was an aggregation group profiles presentation put together by one of Azurity's clients, large GPO Vizient, as part of an update for Azurity. This document contains a customer contact list and detailed vendor information.
a. On Monday May 11, 2026, Defendant sent himself *vizientsupplierpediatricprogoverview.pdf*, which is a presentation prepared by GPO Vizient for Azurity. It is third-party information provided to Azurity in confidence, and it specifically is labelled as such with the footer "confidential information."

f. On Wednesday May 13, 2026, Defendant sent himself *Gitomer Market Access GPO.IDN Business plan Nov 12 2025 (2).pptx*, which is a PowerPoint presentation detailing Azurity's different brands and portfolios, including action plans and non-public "headwinds" and "tailwinds" information.
g. On Wednesday May 13, 2026, Defendant sent himself *Spring 2026 IDN Summit IDN and Health System Executives - Sponsor Contact List - Post Event.xlsx*, which contained an extensive list of clients, client contact names, titles, emails, phone numbers, and addresses.
h. On Wednesday May 13, 2026, Defendant sent himself *Univ of CA Email.pdf*, which included an email thread listing University of California client contacts, pharmaceutical representatives, and potential meeting times.
i. On Wednesday May 20, 2026, Defendant sent himself *2024 IDN CONTACTS.xlsx*, which contained a list of customers, their contact names and information, and notes about each customer relationship.
j. On Friday May 22, 2026, Defendant sent himself *Gitomer Projects.xlsx*, which is an internal-use document detailing an extensive list of client contacts, customer information, and specific notes about client relationships.
k. On Friday May 22, 2026, Defendant sent himself *Azurity Payer Deck 2026.final.ppt*, which is a PowerPoint presentation created for exclusive presentation to Azurity's customers and never shared outside of the organization.
l. On Tuesday May 26, 2026, Defendant sent himself *Azurity Contract Performance 2026.05.22 - to share.xlsx*, which contained detailed non-public business information including gross and net profit calculations, break-even analysis, pricing and market access models, and third-party licensed data.
m. On Tuesday May 26, 2026, Defendant sent himself *Advantus Health AZ GPO AGR.docx*, which is a pharmacy purchase agreement between Azurity and Advantus Health Partners containing agreed terms, fees, and customer preferences.
n. On Thursday, May 28, 2026, Defendant sent himself *Email fw Vivimusta 340b pricing with Cencora.pdf*, which forwarded an email from December 2025 regarding a pricing discrepancy inquiry from Loyola University Medical Center and their interest in an additional Azurity product.
o. On Friday May 29, 2026, Defendant sent himself *Vivimusta 340b pricing with Cencora.pdf*, which contained proposals for services to Loyola including product interests, pricing terms, and customer contacts.
p. On Friday May 29, 2026, Defendant sent himself *Email FW Danziten - Nilotnib - Limited Distribution model opportunity.pdf*, which contained customer information for Ochsner Health, contact information, availability details, and customer interest correspondence.
q. On Monday June 1, 2026, Defendant sent himself *VON - Danziten facilities.xlsx*, which detailed facilities where Azurity drugs are sold, product need designations, strategy data points, and customer information.
r. On Tuesday June 2, 2026, Defendant sent himself *Email Fw Azurity Dolly Parton Children's Hospital WAC Purchases to 340B Pricing.pdf*, which

forwarded an email chain from the previous month regarding a customer's business request to update pricing.

s. On Tuesday June 2, 2026, Defendant sent himself *Email re Nymalize Contract.pdf*, which forwarded an email chain from the prior month discussing customer Nymalize's contract details.

t. On Thursday June 4, 2026, Defendant sent himself *Email thread - UF Health.pdf*, which forwarded an email chain from February 2026 in which University of Florida College of Pharmacy representatives discussed meeting times, contact information, and pricing and contract offer details.

u. On Friday June 5, 2026, Defendant sent himself *Vizient CP Pharm Supplier Agrmt FE (2018-07-20).pdf*, which is a supplier agreement between Azurity and Vizient containing protected market information, including negotiated prices and percentage discounts.

v. In this same email Defendant also sent himself *Vizient AZ Amend #6 RX2840 (2024-04-29) (66060e2286).pdf*, which is an amendment to the Vizient Supplier Agreement containing non-public WAC pricing, discounts, contract dates, and base prices.

w. *Vivimusta Chargeback (iContracts) 2025 to Current.xlsx*: A sheet detailing chargeback information for Azurity's pharmaceutical product Vivimusta, including units bought and rebated to customers, aggregate purchasing data, and targeting information valuable to any pharmaceutical business developing oncology products.

70. These materials reflect nonpublic information concerning Azurity's strategic objectives, customer relationships, product positioning, and planned tactics for various pharmaceutical products.

**D. Azurity's Discovery of and Response to Defendant's Misconduct**

71. As a result of its investigation into Defendant's conduct, Azurity discovered that Defendant had forwarded confidential and proprietary records to his personal email address on multiple occasions prior to his departure.

72. On August 7, 2026, Azurity, through undersigned counsel, sent a Cease-and-Desist letter (the "Letter") to Defendant notifying him of his post-employment restrictive covenant obligations and demanding that he comply with his confidentiality obligations. A true and correct copy of the Letter is attached hereto as **Exhibit 1**.

73. The Letter informed Defendant that Azurity's investigation had revealed that he

improperly forwarded confidential or proprietary and/or trade secret records to his personal email address on multiple dates in advance of his separation.

74. The Letter demanded, among other things, that Defendant: (a) acknowledge his awareness of various post-employment obligations; (b) certify that he is not in violation of the Agreement's terms; (c) immediately return to Azurity all physical or electronic copies of confidential information and records in his possession, custody, or control; (d) make all personal email accounts, cloud storage accounts, and personal devices available for forensic examination; and (e) certify that he has not disclosed any of Azurity's confidential information to Shorla or any third party.

75. Defendant failed to respond to the Letter by the imposed deadline.

**E. Damage to Azurity**

76. Confidential and proprietary information and trade secrets like the foregoing give a level of insight into Azurity's operations that no competitor could otherwise obtain.

77. Azurity's strategic business plans for such pharmaceutical products disclose non-public revenue, market share, forecasts, targets, and a candid internal assessment of Azurity's strengths, weaknesses, and planned positioning.

78. The confidential and proprietary information and trade secrets show a competitor precisely how Azurity is profitable, where it might be vulnerable, and how it measures success.

79. A rival with that plan in hand would know it could underprice Azurity without ever having to develop that intelligence independently.

80. The confidential and proprietary information and trade secrets derive independent economic value from not being generally known to, or readily ascertainable by, Azurity's competitors and would provide any such competitor with an unfair competitive advantage if

obtained.

81. If Defendant is not stopped immediately, business will be diverted which may be irretrievable, causing Azurity irreparable damage.

82. Plaintiff Azurity asks this Court to act quickly to protect its Trade Secrets and to prevent Defendants from sharing the Trade Secrets.

83. Because the misappropriation only just came to light, Azurity continues to investigate the extent of the misconduct waged against it.

**F. Azurity's Entitlement to Injunctive Relief**

84. Azurity has clearly ascertainable rights in need of protecting including to preserve and maintain the integrity of its confidential and proprietary information and trade secrets together with the goodwill and market share it expended significant time and resources to create.

85. Defendant is prohibited from, among other things, retaining, disclosing, or using Azurity's confidential, proprietary information and trade secret information.

86. Defendant has engaged in and is continuing to engage in conduct that constitutes a violation of numerous provisions in Azurity's policies and is otherwise unlawful.

87. Azurity has suffered and will continue to suffer irreparable harm and economic damages as a result of Defendant's unlawful conduct. Moreover, Azurity has an urgent need to protect its legitimate business interests.

88. There is no adequate remedy at law that might address the irreparable injury caused by Defendant's actions. Absent relief, there is no way to accurately forecast the effect on Azurity's business over time or the extent of the long-term damages due to Defendant's actions.

89. Azurity is likely to prevail on the merits in this action. Should Azurity be required to wait until a full trial on the merits to enforce its legal rights, however, it will be irreparably

harmed because it will continue to lose business, goodwill, and customers that it may never recover.

90. Injunctive relief is not contrary to the public health, safety, or welfare. Moreover, issuing injunctive relief will serve the public interest, and the harm to Azurity absent the requested relief strongly outweighs the risk of harm to Defendant should injunctive relief be granted. The public interest is, in fact, served by an injunction, as it protects Azurity's confidential information and goodwill and enforces those contractual promises that Defendant made to Azurity as a condition of employment and as consideration for Azurity's agreement to give Defendant access to its clients and confidential information in the first place.

## CAUSES OF ACTION

### COUNT I
### MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, et seq.

91. Azurity realleges and incorporates by reference the foregoing paragraphs above as if fully set forth herein.

92. While employed by Azurity, Defendant had access to Azurity's confidential and proprietary information and trade secrets, including its confidential product and market-strategy data, business operations and strategic plans, as described above.

93. Azurity expended substantial time, effort, money, and resources in developing and maintaining Azurity's confidential, proprietary, and trade secret information.

94. Azurity takes reasonable, affirmative measures to maintain the confidentiality of Azurity's confidential, proprietary, and trade secret information for Azurity's exclusive benefit and competitive advantage, including the measures described above.

95. Azurity provided access to its confidential, proprietary, and trade secret information

in the course of employing Defendant.

96. Azurity's confidential, proprietary, and trade secret information that Defendant had access to is related to Azurity's products or services that are used or intended for use in interstate or foreign commerce.

97. Disclosure and unauthorized use of this type of information would undermine Azurity's competitive position in the highly competitive pharmaceutical industry.

98. Azurity's confidential, proprietary, and trade secret information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors such as Shorla.

99. Azurity's confidential, proprietary, and trade secret information constitute information subject to protection under the DTSA, 18 U.S.C. § 1839(3), and relate to services used in, or intended for use in, interstate commerce.

100. Defendant knew of the duty to maintain the secrecy of, and not disclose or misappropriate, Azurity's confidential, proprietary, and trade secret information, and to return any such information in his possession upon separation.

101. Defendant misappropriated Azurity's confidential, proprietary, and trade secret information by acquiring, retaining, and, upon information and belief, transmitting them without authorization and for purposes not permitted by Azurity.

102. Defendant misappropriated Azurity's confidential, proprietary, and trade secret information, or appropriated them without authorization, by taking, retaining, and not returning them after his employment with Azurity ended.

103. Defendant plans further misappropriation of Azurity's confidential, proprietary, and trade secret information, by - on information and belief - seeking to disclose them to Shorla

or use them in connection with his subsequent employment with Shorla, as evidence by his failure to provide assurances that he would not do so after receiving the cease-and-desist letter sent on Friday August 7, 2026.

104. Defendant's misappropriation was willful and malicious.

105. As a direct and proximate result of Defendant's misappropriation of Azurity's confidential, proprietary, and trade secret information, Azurity has suffered, and will continue to suffer, irreparable harm and economic damages, including disruption of business, lost revenues and profits, and unjust enrichment not otherwise accounted for in computing actual loss.

106. Unless Defendant is permanently restrained and enjoined from using or disclosing the Azurity's confidential, proprietary, and trade secret information, Azurity will suffer irreparable injury, as Defendant will continue to have the ability to use or disclose Azurity's confidential, proprietary, and trade secret information for his own benefit or that of Shorla.

107. Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, Azurity is entitled to injunctive relief, compensatory damages, exemplary damages, an award of reasonable attorneys' fees, and other appropriate relief.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS UNDER THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT, 12 Pa. C.S.A. § 5301, et seq.

108. Azurity realleges and incorporates by reference the foregoing paragraphs above as if fully set forth herein.

109. Azurity's confidential, proprietary, and trade secret information constitute trade secrets subject to protection under the PUTSA.

110. Azurity's confidential, proprietary, and trade secret information are not generally known to and are not readily ascertainable by proper means by others who can gain economic

value from its use and/or disclosure.

111. Azurity exercises reasonable efforts to maintain the secrecy of its trade secrets and confidential information.

112. As an employee of Azurity, Defendant had access to Azurity's confidential, proprietary, and trade secret information.

113. Defendant knew of his duty to maintain the secrecy of, and not disclose or misappropriate, Azurity's confidential, proprietary, and trade secret information, and to return any such information in his possession upon separation.

114. Defendant misappropriated Azurity's confidential, proprietary, and trade secret information, or appropriated them without authorization, by - on information and belief - seeking to disclose them to Shorla in connection with subsequent employment with Shorla.

115. As set forth above, Defendant has misappropriated, accessed, transmitted, communicated, disclosed, and/or utilized Azurity's trade secrets and confidential information for his own benefit and the benefit of Shorla, through improper means and without the consent of Azurity.

116. Defendant's misappropriation was willful and malicious.

117. As a direct and proximate result of Defendant's misappropriation of Azurity's Azurity's confidential, proprietary, and trade secret information, Azurity has suffered, and will continue to suffer, irreparable harm and economic damages, including disruption of business, lost revenues and profits, and unjust enrichment.

118. Unless Defendant is permanently restrained and enjoined from using or disclosing the Azurity's confidential, proprietary, and trade secret information, Azurity will suffer irreparable injury, as Defendant will continue to have the ability to use or disclose Azurity's confidential,

proprietary, and trade secret information for his own benefit or that of Shorla.

119. Pursuant to Sections 5303 to 5305, Azurity is entitled to injunctive relief, double damages and affirmative relief to protect its confidential, proprietary, and trade secret information, an award of reasonable attorneys' fees, exemplary damages and other appropriate relief.

## COUNT III
## VIOLATION OF THE COMMON LAW DUTIES OF CONFIDENTIALITY AND LOYALTY

120. Azurity realleges and incorporates by reference the foregoing paragraphs as if set forth in full below.

121. As set forth above, Azurity employed Defendant as a senior member of its Strategic Accounts team, and trusted Defendant with trade secrets and other confidential information.

122. Defendant owed fiduciary duties of loyalty and confidentiality to Azurity not to actively use his position for his own personal benefit, or for the benefit of other companies such as Shorla, and/or to hinder Azurity's ability to succeed in its business operations.

123. Defendant was reposed with trust and confidence by Azurity, which he knew and voluntarily accepted.

124. During Defendant's employment, Azurity took steps to protect the information from unauthorized use or disclosure.

125. During his employment with Azurity, Defendant breached his duties of loyalty and confidentiality to Azurity by misappropriating confidential information and trade secrets of Azurity prior to leaving to work for Shorla.

126. Through this conduct, Defendant engaged in disloyal acts in anticipation of his future employment with Shorla, breaching his duties of loyalty and confidentiality.

127. Defendant knowingly breached the common law duties of confidentiality and

loyalty owed to Azurity when causing/allowing the disclosure of the protected information because Defendant planned to use the information to benefit himself and his new employer Shorla.

128. As a direct and proximate result of Defendant's breaches of duties, Azurity has suffered damages.

## **REQUEST FOR RELIEF**

Wherefore, Azurity respectfully requests that this Court enter judgment for Azurity and against Defendant as follows:

A. Temporarily, preliminarily, and permanently enjoining Defendant from continuing to violate the Azurity's confidentiality policies, including, but not limited to, enjoining him from using, disclosing, retaining, or further transmitting any of Azurity's confidential and proprietary information and trade secrets that Defendant transmitted via his personal email account, and award Azurity all damages to which it may recover under applicable law suffered as the direct and proximate result of Defendant's violation of his confidentiality obligations and Trade Secrets Acts;

B. Ordering Defendant to immediately return to Azurity any and all of its electronic and hardcopy confidential and proprietary information and trade secrets and to take all steps necessary to effectuate a forensic examination, pursuant to the following protocol:

- Defendant shall provide all computers, computer devices, peripherals, mobile devices, including phones, Internet-based or "cloud"-based storage sites or services, or other information-storing equipment, software, or services (collectively "Storage Locations"), including any access information, in which he or anyone with whom he is associated (including, but not limited to, Shorla) have stored information belonging to Azurity at any time or to which he or anyone with whom he is associated have at any time connected any other Storage Location that contained Azurity's information (including private email accounts) to the third-party within five (5) calendar days after the entry of an Order from this Court.

- The third-party will perform forensic imaging of the devices and accounts and maintain a chain of custody.

- Using the forensic images, the third-party will perform an inspection of Defendant's devices and accounts. The inspections will not harm Defendant's devices and accounts and

will be conducted in a manner to prevent the compromising of Defendant's personal and confidential data. Only the third-party will inspect or otherwise handle the devices and accounts.

- The third-party will inspect the devices and accounts for all electronically stored information of any kind (including, without limitation,, e-mails, texts, communications, WhatsApp messaging, documents, calendar entries, tasks, or attachments) with a creation, modification date or access date between January 1, 2026 and the present, which relate in any way, to: (a) Azurity; (b) Azurity's current, former, or prospective customers or clients; and (c) the allegations, claims, defenses or underlying facts in this action. Azurity will provide Defendant with a list of search terms for his review and input.

- The third-party also may analyze use, deletion, forwarding, accessing, copying or alteration activities performed on the devices as to any documents, email messages, or other files related to Defendant's work for Azurity.

- The third-party also may recover documents, email messages, or other files that have been deleted and may perform analysis regarding deletion, forwarding, access, copying, uploading, downloading, or other activities performed on the devices or accounts.

- The third-party will provide the results of the inspection for Defendant's review. Files obtained through the inspection will not be provided to Azurity until after Defendant has a reasonable opportunity to review the inspection results, not to exceed ten (10) calendar days after receiving the inspection results.

- If Defendant maintains that any electronically stored information found through the inspection should not be provided to Azurity, Defendant will assert such objections within five (5) days of receiving the results of the inspection from the third-party and will provide a privilege log consistent with Rule 26(b)(5)(A)(ii) of the Federal Rules of Civil Procedure identifying the basis for his objection to the production of the electronically stored information.

- Any of Azurity's confidential information and/or trade secrets, including email containing such information, will be deleted from the devices and accounts before the devices are returned to Defendant. The parties will confer to ensure such deletion does not include Defendant's personal information and data.

C. Enjoining Defendant from in any way divulging, disseminating, or utilizing Azurity's confidential and proprietary information and trade secrets in the interim and permanently (including - but not limited to - following a thorough forensic account requiring Defendant to permanently delete and/or destroy all copies of such confidential and proprietary information and trade secrets in his possession, custody, or control, in whatever form and on whatever device or

account such information resides, and to certify such deletion and destruction in writing under oath);

D. Temporarily, preliminarily, and permanently enjoining Defendant from continuing to violate any of his confidentiality obligations;

E. Temporarily, preliminarily, and permanently enjoining Defendant from continuing to violate any of his confidentiality obligations and the Trade Secrets Acts including, but not limited to, enjoining him from continuing to solicit or attempt to solicit, call upon, contact, communicate with, or accept directly or by assisting others, any competitive business as described above from any current or prospective customers of Azurity whom he came to know, came to service, had material contact with or came to learn the identity of or about whom he had confidential and proprietary information and trade secrets while he was employed by Azurity; and

F. Entering judgment against Defendant, and awarding Azurity all damages available under applicable law together with prejudgment and post-judgment interest, costs, attorneys' fees, and such other and further relief, at law or in equity, as the Court deems just.

G. Awarding any other relief as the Court may deem appropriate or just, proper and equitable.

Date: August 17, 2026

Respectfully submitted,

**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**

*s/Karen Baillie*
Karen Baillie, PA I.D. No. 66780
One PPG Place, Suite 1900
Pittsburgh, PA 15222
Telephone: 412-394-3333
karen.baillie@ogletreedeakins.com

Parker E. Thoeni, MD #0812180219 (Pro Hac Forthcoming)
One South Street, Suite 1800
Baltimore, MD 21202
Telephone: 410-843-3466
parker.thoeni@ogletree.com

Rebecca Rosen, PA. I.D. No. 336865
1735 Market St Ste 3000
Philadelphia, PA 19103
Telephone: 215-995-2800
rebecca.rosen@ogletree.com

Tyler W. Hartney, MN #0400100 (Pro Hac Forthcoming)
225 South Sixth Street, Suite 1800
Minneapolis, MN 55402
Telephone: 612-339-1818
tyler.hartney@ogletree.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC.<br><br>Plaintiff,<br><br>v.<br><br>MIKE GITOMER<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. ____________________ |

## VERIFICATION

**CHAD COLLINS** states that:

1. I am the CHIEF COMMERCIAL OFFICER, Noth America of AZURITY PHARMACEUTICALS, INC. ("Azurity") and I am authorized to execute this Verification on behalf of Azurity.

2. I have read the foregoing Verified Complaint for Injunctive and Other Relief, and I believe it to be true and correct to the best of my knowledge, as of the date of signing, based upon my personal knowledge as well as the information and business records of Azurity made available to me. I make this verification subject to the penalties of 28 U.S.C. § 1746 under penalty of perjury.

Signed on August 15, 2026 | 10:10 AM EDT

Signed by:
Chad Collins
D1394A508239417...
CHAD COLLINS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC. | ) | |
| | ) | Civil Action No. ____________________ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL GITOMER | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

I certify that on this date I have filed this document with the Clerk of Court and sent to Defendant via email at mgit@comcast.net and to the address below via Federal Express.

Michael Gitomer
386 Amber Drive
Lititz, PA 17543

Dated: August 17, 2026

*/s/Rebecca J. Rosen*
Rebecca J. Rosen

*Attorney for Plaintiff*